## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| **BREE BOULAIS,**<br>*Plaintiff,*<br><br>**v.**<br><br>**CITY OF WARWICK and WARWICK WATER DIVISION, by and through Mayor Frank J. Picozzi, in his official capacity,**<br>*Defendant.* | **C.A. No. 1:24-cv-00236**<br><br>**PLAINTIFF DEMANDS TRIAL BY JURY** |

## COMPLAINT

This action is commenced by Bree Boulais (hereinafter "Plaintiff") against the City of Warwick and Warwick Water Division (hereinafter "Defendants") to remedy and seek relief for unlawful employment practices, specifically sexual and gender harassment and retaliation for protected acts, arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *Rhode Island Fair Employment Practices Act*, R.I. Gen § 28-5-1 *et seq*., ("FEPA"), and the *Rhode Island Civil Rights Act of 1990,* R.I. Gen. Law § 42-112-1 *et seq.* (hereinafter "RICRA").

## PARTIES

1. Plaintiff presently resides in the City of Wakefield, County of Washington, within the State of Rhode Island and formerly worked for Defendants at the Warwick Water Division in Rhode Island.

2. Defendant City of Warwick is a government municipality in Rhode Island, and is a state actor sued by and through Mayor Frank J. Picozzi in his official capacity; the principal place of business is Warwick, Rhode Island.

1

3. Warwick Water Division is a public body, upon information and belief, that is a division of the government municipality, City of Warwick, with a principal place of business in Warwick, Rhode Island, and was the division that specifically employed Plaintiff.

## JURISDICTION AND VENUE

4. This Court has jurisdiction to hear the Complaint pursuant to 28 U.S.C. § 1331.

5. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. Plaintiff's state claims are so related to Plaintiff's federal claims that they form part of the same case or controversy. Consideration of judicial economy, fairness, and convenience warrants this Court's exercise of supplemental jurisdiction over Plaintiff's state law claims.

6. This Court has personal jurisdiction over Defendant because Defendant has the requisite minimum contacts with the State of Rhode Island and availed itself of the rights and privileges in Rhode Island by conducting interstate commerce in Rhode Island; this Court exercising personal jurisdiction over Defendant does not offend the traditional notion of fair play and substantial justice.

7. Venue of this action lies under Title VII pursuant to 42 U.S.C. § 2000e-5(f)(3) for the Title VII claims under all applicable factors because Rhode Island is the: (a) State in which the unlawful employment practice is alleged to have been committed, (b) in the judicial district in which the employment records relevant to such practice are maintained and administered, and (c) the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice.

8. Venue of this action for the remaining claims is proper pursuant to 28 U.S.C. § 1391(b) because Defendants conduct business in the State of Rhode Island, because the alleged unlawful practices

occurred in Rhode Island, and because the evidence exists, in part, in Rhode Island, and thus this judicial district of this Court is proper.

## ADMINISTRATIVE PROCEDURES

9.    On or about November 17, 2023, Charges of Discrimination were timely filed with the Rhode Island Commission for Human Rights (RICHR) and co-filed with the Equal Employment Opportunity Commission (EEOC).

10.    On or about April 1, 2023, RICHR issued its Notice of Right to Sue and thereafter the EEOC issued its Notice of Right enabling this private civil action to be filed (RICHR NO. 24 EMP 105).

11.    On or about August 9, 2023, the EEOC issued its Dismissal and Notice of Rights enabling this private civil action to be filed (EEOC NO 161-2024-00022).

12.    This Complaint was timely filed after issuance of the RICHR and EEOC Notice of Right to Sue.

## FACTUAL ALLEGATIONS

13.    From April 2021 through her constructive discharge on October 11, 2023, Plaintiff worked for the Warwick Water Department ("employer" or "Water Division") in Warwick, RI as the Water Project Supervisor.

14.    Plaintiff is a female and as such is afforded the protections of Title VII and state analog laws.

15.    At all times relevant since her hiring, Plaintiff's performance met or exceeded her employer's legitimate expectations.

16.    In or around April of 2021, Plaintiff's employment began at the Warwick Water Department as Water Project Supervisor.

17.    For the first year, Plaintiff did her job well and there were no offensive events.

18. However, it was apparent that the leadership of the Water Department seemed to foster an environment of sexism and inappropriateness; to Plaintiff, it felt like a 'boys club' based on how the men talked about women openly.

19. However, by the Spring of 2022, the environment started to become hostile for Plaintiff because of her sex.

20. On or around March 11, 2022, Jason Parmelee (hereinafter "Mr. Parmelee"), the City Controller of finances for the City of Warwick, arrived at the Water Division to have a meeting with the Director of the Water Division, Terry DiPetrillo (hereinafter "Mr. Terry[1] DiPetrillo") and Michael St. Pierre (hereinafter "Mr. St. Pierre"), the Business Financial Manager, in regard to budget concerns for upcoming projects.

21. When Mr. Parmelee arrived, only a "hello" was exchanged between himself and Plaintiff as he was making his way into the Director's office.

22. At approximately 2:00 pm that day Plaintiff received an email from Mr. Parmelee after he had left the offices.

23. The email from Mr. Parmelee stated, "Hey there. I was just over there… I don't think I ever realized how attractive you are. Super Cute… Well, have a great weekend haha!"

24. Plaintiff was offended especially since she had a fiancé, and all of her male coworkers and supervisors knew she had a fiancé.

25. The comment in the email was both subjectively and objectively offensive.

26. After reading Mr. Parmelee's inappropriate email, Plaintiff responded the same day, to ensure she set the appropriate boundary.

---

[1] Terry's brother Michael DiPetrillo also worked with Plaintiff so both will be referred by their full names.

27. In her email Plaintiff stated, "I gave no indication to you when you were here that sending me an e-mail like this, especially through a work e-mail, was acceptable. I find your comments extremely inappropriate, as well as, unprofessional. Moving forward this will not be tolerated."

28. During this time, Plaintiff reported the email from Mr. Parmelee to her Director, Mr. Terry DiPetrillo and her Manager Mr. St. Pierre.

29. They treated this meeting as informal which made Plaintiff uncomfortable; Mr. Terry DiPetrillo and Mr. St. Pierre left the door open.

30. When Plaintiff entered Mr. Terry DiPetrillo's office she informed him that she wanted to show him an email she received from Mr. Parmelee.

31. Plaintiff continued to inform him that she had already responded to Mr. Parmelee because she wanted it to be known that she would not allow that type of comment from a coworker.

32. Mr. Terry DiPetrillo and Mr. Michael St. Pierre reassured Plaintiff action would be taken and that they would talk to Peter Shafter (hereinafter "Mr. Shafter") who was the Director of Finance and Mr. Parmelee's direct boss.

33. Upon information and belief, Mr. Parmelee had a history of harassing women and the Warwick Water Department leadership had knowledge of this fact, and thus, were on notice.

34. However, despite this notice, leadership of the Warwick Water Department had failed to appropriately deal with Mr. Parmelee with given that he harassed Plaintiff that day[2].

35. On or around March 14, 2022, the Monday after Plaintiff reported the sexual harassment she had experienced by Mr. Parmelee to Mr. Terry DiPetrillo and Mr. St. Pierre, Plaintiff received an email from her Director, Mr. Terry DiPetrillo in which stated, "You look stunning."

---

[2] Mr. Parmelee may have been terminated after this point and it may have had to do with his ongoing inappropriate comments to women, upon information and belief. Nonetheless, he was left free to harass Plaintiff that day.

36. After Mr. Terry DiPetrillo sent Plaintiff the email, he approached her desk in a taunting manner, with a smirk on his face, and stated "Did you receive my email?"

37. He then laughed and proceeded to leave the building for the day.

38. These comments were subjectively and objectively offensive.

39. Plaintiff was left in bewilderment and was very uncomfortable.

40. Plaintiff felt blind-sided as only days prior she had expressed concern regarding Mr. Parmelee's inappropriate comments to her about her appearance.

41. While Plaintiff expected her Director to take swift and remedial action to ensure that her workplace was free from sexual harassment, instead, Mr. Terry DiPetrillo made *his own* unwanted inappropriate comment toward Plaintiff just days later.

42. The following day, on or about March 15, 2022, Plaintiff and other co-workers were gathered in the office of the Operations Aid, Peter Broomfield's (hereinafter "Mr. Broomfield"), discussing work-related matters.

43. Mr. Terry DiPetrillo entered the room and, in front of their coworkers, commented, "Bree, I believe I left my socks by your bedside."

44. In disbelief by his comment, Plaintiff paused for a moment.

45. Plaintiff was subjectively offended at the implication that she was at his house and leaving her clothing items there, which had an inappropriate connotation and did not happen.

46. Further, this comment is objectively offensive.

47. Not only did the comment make Plaintiff feel disgusted and uncomfortable, but this comment was humiliating and made it seem, in front of her coworkers, as though she was having an affair with the director, a fact which was very untrue.

48. Mr. Terry DiPetrillo then proceeded to make another comment, to Richard Moniz (hereinafter "Mr. Moniz"), the Lead Meter Tech, which was even more significantly inappropriate, humiliating, and offensive.

49. Mr. Terry DiPetrillo stated to Mr. Moniz, "[w]ant to come by Bree's later and run a train on her[3]?"

50. Plaintiff felt violated and humiliated by Mr. Terry DiPetrillo's unwanted sexual comments.

51. Not only did Mr. Terry DiPetrillo's grotesque comment make Plaintiff feel disgusted and uncomfortable, but his second comments *also* made it seem, in front of her coworkers, as though she was having an affair with the director, a fact which was very untrue.

52. As a woman, comments such as these are extremely detrimental to Plaintiff's professional image and career.

53. These comments were subjectively and objectively offensive.

54. These comments, and the looks Plaintiff received from her coworkers, brought her to tears.

55. After the offensive comment Mr. Terry DiPetrillo made about "running a train on [Plaintiff]" and other comments she got around the office, Plaintiff complained to one of the other superiors, Mr. St. Pierre.

56. Mr. St. Pierre gave Plaintiff the impression he would take care of it so she did not need to go to HR.

57. In fact, they were encouraged to report concerns within the office and chain of command first before going to HR.

---

[3] The sexual connotation in the statement was obvious to Plaintiff and she took the comment to mean Mr. Terry DiPetrillo was offering to 'running a train' on her as in have both men have sex with her. According to dictionary.com, the slang is defined as meaning, "To run train (or run a train) refers to when multiple men have sex with a woman one after the other, with or without consent…"https://www.dictionary.com/e/slang/run-train/ last visited 11/12/2023

58. Moreover, these comments were by Plaintiff's Director and thus, there was no higher authority she could report this to, and she feared reporting it to HR due to his potential retaliation.

59. Plaintiff began to avoid Mr. Terry DiPetrillo, but his harassment continued through 2022 and 2023.

60. However, additionally, around this same time in early 2022, Plaintiff began being harassed, in an intimidating manner, by Mr. Terry DiPetrillo's brother, Mr. Michael DiPetrillo.

61. Upon information and belief, Mr. Terry DiPetrillo had made his brother, Mr. Michael DiPetrillo, a supervisor.

62. Mr. Michael DiPetrillo's desk was right behind Plaintiff during 2022, and throughout her tenure.

63. The position of their work areas made Plaintiff's work environment very hostile in 2022 when Mr. Michael DiPetrillo began targeting her.

64. Plaintiff believes his harassment was because of her gender, because he used intimidation and the threat of physical violence, which he did not with male coworkers.

65. Notably, Mr. Michael DiPetrillo also had sexist and womanizing behavior in the workplace and he was having a sexual affair with a coworker which Plaintiff knew about, which further made her uncomfortable.

66. For background, in or around September 2021, which was not long after Plaintiff started working there, Michael DiPetrillo, the foreman of the Water Division (and brother of Director Mr. Terry DiPetrillo), and Krystal Ducharme (hereinafter "Ms. Ducharme"), who had a role in customer service, became open around the office about their affair.

67. Upon information and belief, both Ms. Ducharme and Mr. Michael DiPetrillo are married to different people.

68. Ms. Ducharme and Plaintiff became friends when she first began working at the Water Division in 2021.

69. However, upon hearing of their affair, Plaintiff began distancing herself from Ms. Ducharme as Plaintiff did not want to be involved and the illicit affair made her uncomfortable.

70. Specifically, Ms. Ducharme and Mr. Michael DiPetrillo's affair made Plaintiff uncomfortable because they would openly talk about being together and even make sexually explicit comments in the office to each other which made Plaintiff (and other coworkers) uncomfortable.

71. By 2022, the explicit sexual comments between the two of Mr. Michael DiPetrillo and Ms. Ducharme, became grotesque and created a severely hostile work environment.

72. For example, later, by in or around December of 2022, Mr. Michael DiPetrillo would make wholly explicit sexual comments to Ms. Ducharme such as, "I'm going to put my balls in your mouth."

73. Plaintiff's desk was next to Ms. Ducharme's and as a result she had to overhear their inappropriate conversations.

74. Hearing these comments, which were objectively and subjectively offensive, made Plaintiff uncomfortable.

75. Again, Plaintiff complained about those inappropriate comments to Mr. St. Pierre, and Mr. Terry DiPetrillo, again who is Mr. Michael DiPetrillo's brother, was well aware of these comments and had received other complaints.

76. However, before the comments between the two escalated to that level of explicitness, earlier in 2022, the affair caused a hostile environment for other reasons.

77. For example, in or around February of 2022, Mr. Michael DiPetrillo's wife would show up to the office and scream at Ms. Ducharme from the parking lot.

78. This escalated to the point of Ms. Ducharme becoming paranoid that Mr. Michael DiPetrillo's wife would harm her during her commute.

79. As a result, Ms. Ducharme asked that Plaintiff follow her home.

80. Plaintiff did not want to be involved but at that time, Plaintiff was friends with Ms. Ducharme and she asked for Plaintiff's help.

81. By the third time Ms. Ducharme asked Plaintiff to follow her home for her safety, Plaintiff had a conversation with her and informed her that in Plaintiff's opinion, "[the affair] is reaching a point where its unhealthy".

82. With respect to Ms. Ducharme's feelings, Plaintiff further shared her opinion with Ms. Ducharme that "it's not fair to either party, he could be telling you everything you want to hear and going home to his wife and telling her the same thing."

83. After this conversation, Mr. Michael DiPetrillo seemed angry with Plaintiff and thus, she began to distance myself from my coworker Ms. Ducharme.

84. Not long after the above events, on or around April 1, 2022, during the morning hours of Plaintiff's shift herself and Mr. Michael DiPetrillo exchanged words due to a copy machine being moved.

85. The machine had always been located directly in front of Plaintiff's desk but on that morning, it appeared to have been moved and was now located in a position that made it difficult for Plaintiff to scan documents.

86. This, Plaintiff was informed, started out as a joke between Ms. Ducharme and Mr. Michael DiPetrillo.

87. Plaintiff had asked another employee to give her a hand in returning the machine to its proper place, so that they could utilize all aspects of the printer/copy/scanner, as it is the only machine they had for all employees in the Water Division.

88. As Plaintiff was moving the machine back, Mr. Michael DiPetrillo walked into the office from the back room.

89. When Mr. Michael DiPetrillo entered the office, he looked directly at Plaintiff and said, "Can you just leave the fucking copy machine where it is!"

90. Plaintiff glanced up at him and said, "I wasn't the one who put it in this position, I can't scan items to print."

91. Mr. Michael DiPetrillo became very hostile, retreated from the office and slammed the door as hard as he could.

92. At 1:00 pm that day, Plaintiff was walking out to her car to take her lunch break.

93. Plaintiff was fumbling in her purse to locate her keys when a large metal tool now known as an Angle Grinder, landed just a few feet in front of her.

94. An Angle Grinder is, upon information and belief, a power tool and not just a hand tool.

95. An Angle Grinder is a sizable tool that would have caused physical injury to Plaintiff had it hit her.

96. Alarmed and quickly worried for her safety Plaintiff looked up in the direction the tool came from and standing there was Mr. Michael DiPetrillo.

97. Mr. Michael DiPetrillo glared at Plaintiff without a word and left the tool where it fell.

98. Frightened, Plaintiff immediately went to her vehicle and locked herself inside.

99. Plaintiff took one photo of the tool where it lay and proceeded out of the parking lot in fear of her safety.

100. The first phone call Plaintiff placed was to Peter Broomfield (hereinafter "Mr. Broomfield"), as they were friends and he still remained in the office at that time.

101. Plaintiff informed Mr. Broomfield of what happened, and he advised her to call the director, Mr. Terry DiPetrillo.

102. Plaintiff did as instructed, and Mr. Terry DiPetrillo, Michael DiPetrillo's brother, advised Plaintiff to not return for the day.

103. However, Terry DiPetrillo also told Plaintiff to "keep this to [herself] for the time being" and directed her "not call and inform" the other Supervisor Mr. St. Pierre.

104. Plaintiff was directed by her boss and the Director, Mr. Terry DiPetrillo, that he wanted to handle the incident "in-house", meaning he did not want Plaintiff to file a report with the HR Department.

105. Thus, Plaintiff did not call HR as directed, which upset her that she could not report the event.

106. Plaintiff still decided to call her other supervisor, Mr. St. Pierre, to report the harassing event.

107. The conversation with Mr. St. Pierre was over the phone because Plaintiff was out of the office and told not to return.

108. Plaintiff informed him of the incident that had just occurred between Mr. Michael DiPetrillo and her.

109. Mr. St. Pierre was in disbelief and even asked Plaintiff to repeat what had occurred again.

110. Mr. St. Pierre asked if Plaintiff had informed Mr. Terry DiPetrillo yet, to which she responded yes and that she had also informed Mr. Broomfield.

111. Mr. St. Pierre apologized for what had just occurred, asked if Plaintiff was alright, then said that he would wait to hear from Mr. Terry DiPetrillo about the incident.

112. Later that day, Mr. Terry DiPetrillo ordered the office staff, including Mr. Broomfield, Mr. Broomfield's spouse, Mr. Terry DiPetrillo, Mr. Terry DiPetrillo's spouse, Mr. Moniz, Mr. St. Pierre, and Plaintiff, to gather at a restaurant to discuss what had transpired earlier that day.

113. Mr. Terry DiPetrillo asked Plaintiff to explain the details of the incident.

114. After explaining how his brother had thrown a power tool at her from across the parking lot, Mr. Terry DiPetrillo did not appear surprised.

115. Plaintiff stated, "you don't seem too surprised."

116. In response, Mr. Terry DiPetrillo brought it to Plaintiff's attention that his brother, Mr. Michael DiPetrillo, had a history of violence and without going into details, mentioned that his brother had a violent outburst previously in the office.

117. Mr. Terry DiPetrillo continued to reassure Plaintiff that "violence of any kind would not be tolerated" and that he would make sure his brother was held accountable "to the fullest extent."

118. As noted, Mr. Michael DiPetrillo sat at the supervisor desk directly behind Plaintiff, and thus, Plaintiff asked if Mr. Michael DiPetrillo's desk could be moved because she was uncomfortable being in such close proximity to him.

119. Mr. Terry DiPetrillo, nor any other supervisor, ever took action to move Plaintiff's desk or Mr. Michal DiPetrillo's desk.

120. Thus, throughout the remainder entirety of Plaintiff's employment which ended in October of 2023, Mr. Michael DiPetrillo's desk was never relocated away from her.

121. On or around Monday, April 4, 2022, Mr. St. Pierre and Plaintiff were called into Mr. Terry DiPetrillo office to discuss the outcome of the incident that took place on Friday April 1, 2022.

122. Mr. Terry DiPetrillo made Plaintiff aware that he was going to "recuse himself from the investigation and all outcomes" and that Mr. St. Pierre would handle the investigation due to the fact that Mr. Terry DiPetrillo's own brother was involved and he "did not want to show favoritism".

123. Mr. Terry DiPetrillo continued to state that "whatever punishment" Mr. St. Pierre decided on for Mr. Michael DiPetrillo he "would back up."

124. Upon information and belief, Mr. Michael DiPetrillo then changed the story and claimed to his brother, Mr. Terry DiPetrillo, that he did not throw the tool at Plaintiff, but instead the tool fell off the back of his truck when he was going to park in the side yard.

125. Plaintiff heard about Mr. Michael DiPetrillo's new version of the events from Mr. Broomfield, who had been told that version of events by the Director Terry DiPetrillo.

126. Mr. Michael DiPetrillo's claim is untrue because Plaintiff did not see or hear Mr. Michael DiPetrillo's diesel pickup truck idling, so she knew his vehicle was off at the time.

127. Moreover, the tool was too far away from his truck to have fallen off on its own, and as Plaintiff stated, his car was not moving that she saw or heard.

128. Furthermore, the event occurred at the time of day when, due to the lunch break times, Mr. Michael DiPetrillo would not normally be in the parking lot but he would know, again due to lunch break times, that Plaintiff would be walking to the car for her break.

129. While the question was open as to if Mr. Michael DiPetrillo threw the tool at Plaintiff or it fell off his truck, Mr. Broomfield proceeded outside the office to measure the distance that the tool would have had to travel to land where it did in comparison to where Mr. Michael DiPetrillo's vehicle was parked.

130. Upon information and belief, Mr. Broomfield felt the investigation was not going to be fair so he wanted to measure the distance himself to test Mr. Michael DiPetrillo's explanation.

131. Mr. Broomfield then made his way back into the office to clarify how far the tool had actually traveled.

132. Ms. Ducharme was located to the left of Plaintiff's desk and her and Mr. Michael DiPetrillo were discreetly having a conversation.

133. Plaintiff was anxious being near Mr. Michael DiPetrillo after his attempt to assault her.

134. Moreover, it was Plaintiff's understanding that Mr. Michael DiPetrillo *would not be in the office while the "investigation" was occurring*, and he was especially not allowed to be so close to Plaintiff.

135. Mr. Broomfield then walked out of his office to use the copy machine located in front of Plaintiff's desk.

136. Mr. Michael DiPetrillo looked at Mr. Broomfield with a smirk and in a menacing tone asked Mr. Broomfield, "[d]id you find what you were looking for?"

137. Mr. Broomfield responded, "yeah I did and you saying that you didn't throw it is bullshit."

138. Mr. Broomfield then told Mr. Michael DiPetrillo that he should leave the office because he was making Plaintiff uncomfortable.

139. Mr. Michael DiPetrillo angrily responded, "I have no idea what you're talking about."

140. Plaintiff began to panic and said to Mr. Michael DiPetrillo, "you know exactly what we're talking about."

141. Plaintiff continued, "[y]ou know what you did, you know that you tried to hit me with the angle grinder!"

142. Mr. Michael DiPetrillo just laughed and did not even acknowledge her.

143. At this point all three (3) of them began arguing and as the argument escalated Plaintiff was fearful of Michael DiPetrillo so she yelled for Mr. St. Pierre whose office was nearby.

144. Mr. St. Pierre emerged from his office and explained he thought it was in the best interest of everyone involved to report the matter to the HR Department.

145. On or about April 5, 2022, all employees involved in this incident were called down one by one into the HR Department to give their statements as a part of the investigation.

146. Each of the employees were called in to meet with HR Director, Steven Rotondo (hereinafter "Mr. Rotondo") and the Director of the Department of Public Works, which the Department of Water was a division of, Eric Earls (hereinafter "Mr. Earls"), who was Terry DiPetrillo's boss but was also over the whole city Public Works Department.

147. During Plaintiff's statement Mr. Rotondo and Mr. Earls, expressed that they only wanted the facts pertaining to the tool event with Mr. Michael DiPetrillo and "nothing more."

148. That afternoon, Mr. Michael DiPetrillo was called down to give his version of the incident, during which he claimed that he slammed the tool against the ground to remove a bit that was stuck, resulting in it landing almost 25 feet away from him, upon information and belief.

149. Notably, the story Mr. Michael DiPetrillo differed from not only Plaintiff's recollection, but also his own story that he previously provided to his brother and director, Mr. Terry DiPetrillo, when he claimed the tool fell out of his truck.

150. When Plaintiff was back at her desk, Mr. Terry DiPetrillo learned that his brother was being questioned by HR.

151. Suddenly, Mr. Terry DiPetrillo got angry and he proceeded into the area where Mr. Broomfield and Plaintiff were carrying out their workday.

152. Mr. Terry DiPetrillo then approached them and angrily chastised Plaintiff and Mr. Broomfield for reporting the tool event to HR.

153. Specifically, Mr. Terry DiPetrillo stated, "[y]ou should have kept your mouth shut, you guys fucked up."

154. Mr. Terry DiPetrillo then continued, in a threatening manner, "Great job, you got a good man fired."

155. Mr. Terry DiPetrillo then stated, "now you got the corner office involved," meaning that since HR and Mr. Earls were involved, that also meant, based on Plaintiff's understanding, that now the Mayor of Warwick would also be involved.

156. Mr. Terry DiPetrillo's statement sounded like a threat and was in retaliation for Plaintiff and Mr. Broomfield's reports of Mr. Michael DiPetrillo's harassment of Plaintiff to HR.

157. Mr. Terry DiPetrillo continued walking around the office ranting about how Mr. Broomfield and Plaintiff "couldn't keep it to themselves now we're forced to take it to HR," and how, "we could have handled it in house."

158. Plaintiff felt threatened and retaliated against for reporting the harassment by Mr. Terry DiPetrillo's brother Michael DiPetrillo.

159. That day, and ongoing after that event, Mr. Terry DiPetrillo continued ranting in the office and blaming both Mr. Broomfield and Plaintiff for his brother being investigated.

160. In response to the investigation, and in retaliation for Plaintiff and Mr. Bloomfield's accusations against Michael DiPetrillo's harassment of Plaintiff, Mr. Terry DiPetrillo threatened moving Plaintiff and Mr. Broomfield's desk to opposite sides of the office from each other.

161. The investigation went on for months, ending, upon information and belief, in or around June of 2022.

162. The only result of the "investigation" was that Mr. Michael DiPetrillo received a 10-day suspension without pay, as well as *only* a verbal warning, upon information and belief.

163. Notably, throughout the investigation, Mr. Michael DiPetrillo would still come into the office and was near Plaintiff at times, even through it was Plaintiff's understanding that he was not supposed to be near her.

164. Even once Mr. Michael DiPetrillo was suspended he would, upon information and belief, go into the office when Plaintiff was not there on Saturdays and Sundays.

165. During this time, on or around June 9, 2022, Mr. Terry DiPetrillo entered the office and aggressively reprimanded Mr. Broomfield for withholding the daily sheet from his brother Michael DiPetrillo.

166. The daily sheet is a file office employees receive to show where the road crew would be performing work and what work was being performed.

167. If an employee is either terminated or on suspension, they would not receive this daily sheet, because they are not physically there to perform the work that needed to be done that day.

168. Thus, during Mr. Michael DiPetrillo's suspension he would *not* get a daily sheet.

169. When Mr. Broomfield expressed this fact to Mr. Terry DiPetrillo, Mr. Terry DiPetrillo then shouted back at Mr. Broomfield very loudly.

170. Mr. Terry DiPetrillo shouted something to the effect of "I'm the boss" and "I tell you who to send the daily sheets to" and that "I am telling you to send it to my brother".

171. Interestingly, Mr. Terry DiPetrillo referred to his brother, Mr. Michael DiPetrillo, *in the office as "my brother"* rather than using his name.

172. Mr. Terry DiPetrillo then proceeded to his own office, slamming his door with such force that the molding came off of the door frame.

173. Plaintiff's desk was less than 10 feet from Mr. Terry DiPetrillo's office door and she was terrified by his aggressive reaction.

174. A few minutes after Mr. Terry DiPetrillo's outburst, Plaintiff went into the bathroom and cried, feeling scared for her safety.

175. Prior to these events of sexual harassment and retaliation, Plaintiff had wanted to make a career out of working for the city due to the benefits and advancement opportunities and she also needed a job to pay her bills.

176. However, after these events, both Mr. Terry DiPetrillo and Mr. Michael DiPetrillo would give Plaintiff the silent treatment and began to treat her badly in retaliation for her reports.

177. The months following the tool incident, the Director Mr. Terry DiPetrillo was rarely seen inside of the office and would go missing for weeks and days at a time.

178. Mr. St. Pierre started informally acting as the Director in Mr. Terry DiPetrillo's absence.

179. When Mr. Terry DiPetrillo was in the office, he impeded Plaintiff's work and went around her to have others do her job.

180. When Mr. Terry DiPetrillo did arrive in the office, he also remained silent towards Mr. Broomfield and Plaintiff, even during work-related matters that required his assistance.

181. In Mr. Terry DiPetrillo's absence, there were a lot of hold-ups and deadlines were often missed as he needed to authorize most actions.

182. Whenever Plaintiff would go to Mr. St. Pierre with frustrations regarding these hold ups, she would be told things such as "Don't make waves."

183. During this time Plaintiff's authority was often ignored because Mr. Terry DiPetrillo intentionally degraded her authority with her coworkers and even her subordinates.

184. For example, Plaintiff was the only person authorized to make purchases and anytime someone in the office wanted to request the office to pay for something they had to go through Plaintiff.

185. Plaintiff noticed when Mr. Terry DiPetrillo would show up to work, he would sometimes go to Ms. Ducharme to ask her about a purchase, despite him having hired Plaintiff and knowing she is the only authorized person to go to about purchases.

186. On one occasion, Mr. Terry DiPetrillo wanted a water cooler installed in the office.

187. Plaintiff reached out to purchasing to discuss with them and they said they were not eligible because there were laws preventing the use of the office money for a water cooler since the public did not have access.

188. Ms. Ducharme later went to Plaintiff stating that she emailed people to ask about setting up a water cooler in the office.

189. Plaintiff was confused as to why Ms. Ducharme did this as it is not her job, and Plaintiff was her superior.

190. It seemed as though Ms. Ducharme was made to be the middleman between Mr. Terry DiPetrillo and Plaintiff at times, despite Plaintiff being her supervisor, as a way for Mr. Terry DiPetrillo to demean Plaintiff's authority in retaliation for her reports.

191. Ms. Ducharme would also on occasion take calls from vendors that Plaintiff needed to talk to and she would not inform Plaintiff, once again, a duty that was part of Plaintiff's job, but not hers.

192. Often, Ms. Ducharme would also circumvent talking to Plaintiff about a work-related matter that she needed to hear, by going over Plaintiff's head and straight to Mr. St. Pierre.

193. It was more and more common as time went on in 2022 and into 2023, for Ms. Ducharme to skip over Plaintiff in the chain of command and go to Mr. St. Pierre.

194. When Plaintiff brought this up to Mr. St. Pierre during this time, he told her that "cooler heads prevail."

195. Mr. St. Pierre did not correct Ms. Ducharme's disregard of Plaintiff's position or authority, due to Mr. Terry DiPetrillo and Mr. Michael DiPetrillo's retaliation of Plaintiff despite Plaintiff's report to Mr. St. Pierre.

196. Also, when Terry DiPetrillo was in the office, he was disheveled and at times, his eyes seemed glossed over and he would wear flip flops and/or what appeared to be a bathing suit on at least one occasion.

197. The work environment became more and more hostile for Plaintiff, due to Mr. Terry DiPetrillo and Mr. Michael DiPetrillo exiling of her and ignoring her in retaliation for her reports.

198. Their harsh, degrading, and dismissive treatment of Plaintiff carried over into her coworkers' behavior, making the environment even more hostile towards Plaintiff following her reports.

199. For example, Plaintiff would overhear coworkers talking down about her stating things such as, "apparently she doesn't know how to do her job."

200. Another example of the hostility involved Plaintiff's coworkers and subordinates no longer treating her as a supervisor, as her job required; they ignored her authority.

201. Moreover, Ms. Ducharme began to harass Plaintiff in retaliation for her reports about Michael DePetrillo; specifically, she began to report made up complaints about Plaintiff, as her supervisor, to Mr. St. Pierre.

202. Furthermore, in this same time as 2022 continued into 2023, Mr. Michael DiPetrillo continued to go out of his way to make Plaintiff and Mr. Broomfield's job more complicated and hostile by influencing and deterring their coworkers to not talk to them.

203. For example, upon information and belief, Mr. Michael DiPetrillo informed the road crew to avoid Plaintiff, and even placed a sign on the door, stating that they were not to enter the office for any reason.

204. Communicating with the road crew was an important aspect of Plaintiff and Mr. Broomfield's jobs.

205. Blocking access to the office complicated their communications and had no job or business-related reason other than to harass Plaintiff and Mr. Broomfield.

206. This was all done in retaliation for Plaintiff's reports about Mr. Michael DiPetrillo

207. Towards the end of 2022, Mr. Terry DiPetrillo, when he was in the office, would often bring problems in his personal life, allowing them to impact his mood and he would also talk about them around the office.

208. Sometimes, when Mr. St. Pierre, Mr. Broomfield, or Plaintiff had to go into Mr. Terry DiPetrillo's office, he would sidetrack work issues by oversharing inappropriate stories about his personal life for extended periods of time which made Plaintiff feel uncomfortable.

209. The rest of the time Mr. Terry DiPetrillo was unfriendly to Plaintiff, and he also demeaned her, undermined her, and was hostile towards her.

210. On or about November 11, 2022, Mr. St. Pierre sent a text message in a group thread that consisted of Mr. Broomfield and Mr. Terry DiPetrillo.

211. Mr. St. Pierre was not aware that Mr. Terry DiPetrillo was a part of the group message.

212. Mr. St. Pierre's text message stated, "What the fuck, I wish he would go mope in his own office. I'm trying to fucking work. I don't want to hear his derelict stories."

213. Upon Mr. Terry DiPetrillo receiving this text message, he exited his office, slamming the door, where again the molding came off of its frame, and proceeded to yell aggressively.

214. At the time, it was only Mr. St. Pierre, Ms. Ducharme, Mr. Broomfield, and Plaintiff in the office.

215. Mr. Terry DiPetrillo started yelling at them saying, "I've been a good boss," "I can't fucking believe this," "This is bullshit," "This ends now," and ended his yelling with, "fuck you guys."

216. Everyone present in the office was confused as none of them knew why Mr. Terry DiPetrillo was yelling.

217. Mr. Broomfield was on the phone with a customer and he spoke up, telling Mr. Terry DiPetrillo to be quiet; this resulted in a verbal argument with Mr. Terry DiPetrillo trying to order Mr. Broomfield to go home despite him having work to do.

218. Later on in the afternoon Mr. Broomfield requested an appointment with Personnel/HR to file a report against Mr. Terry DiPetrillo for his violent behavior displayed in the office to himself and Plaintiff.

219. On or around November 14, 2022, Mr. Earls and Mr. Rotondo came into the Water Division once again.

220. Plaintiff was soon called down to Personnel for a meeting with Mr. Earls and Mr. Rotondo.

221. Mr. Rotondo informed Plaintiff that they were conducting a "character investigation" into Mr. Terry DiPetrillo.

222. Mr. Rotondo then stated that everything in the meeting would remain confidential.

223. Mr. Rotondo began asking Plaintiff questions and wanted her to describe the office environment.

224. Plaintiff stated that, "it didn't get here over night," as the office environment was complicated due to the many inappropriate events that had occurred thus far.

225. Thus, Plaintiff shared details about Mr. Terry DiPetrillo's ongoing retaliation for her reports about his brother's harassment, and also reported Mr. Terry DiPetrillo's prior sexual harassment.

226. Mr. Earls interrupted Plaintiff and stated, "please stay on topic."

227. Plaintiff was taken back by Mr. Earls interruption as she reported retaliation for prior gender-based aggressive treatment by Mr. Michael DiPetrillo and her reporting of sexual harassment by his brother and the Director, Mr. Terry DiPetrillo.

228. Mr. Earles brushed Plaintiff's reports of unlawful treatment off.

229. Plaintiff persisted and continued to report what Mr. Terry DiPetrillo had said to her, such as making comments implying they were having an affair and publicly talking about "running a train" on her.

230. Mr. Rotondo looked at Plaintiff in disbelief, seemingly shocked at what she was reporting.

231. However, Mr. Earls once again interrupted Plaintiff and said, "Bree this is irrelevant, move along we all have places we need to be."

232. Plaintiff was shocked by Mr. Earls dismissive response to her report and could feel herself becoming emotional.

233. Mr. Rotondo asked if Plaintiff had anything else to add to which she responded, "I think we're done here," and excused herself.

234. As a result of the investigation done by the HR Department Mr. St. Pierre was given a letter of reprimand for the text message he sent which upset Mr. Terry DiPetrillo; upon information and belief there was no action taken against Mr. Terry DiPetrillo.

235. On or around the end of November 2022, Plaintiff was called into Mr. Terry DiPetrillo's office where Mr. St. Pierre was present.

236. Mr. Terry DiPetrillo, suddenly informed Plaintiff that she would be suspended for failing to meet deadline.

237. Plaintiff was confused as she had not missed any deadline.

238. Mr. Terry DiPetrillo continued that, after Plaintiff "served [her] suspension", her desk would be moved to a location directly next to the restrooms.

239. Plaintiff assured Mr. Terry DiPetrillo that she did in fact meet the deadline for the bid in question.

240. Mr. Terry DiPetrillo was dismissive, told Plaintiff to return to her desk, and claimed he would "double check" his information.

241. In response to this threat when she had done nothing wrong, Plaintiff emailed the Chief of Staff to the Mayor, Susan Nahabedian and included the HR Director, Mr. Rotondo, on the email.

242. Plaintiff reported concerns with retaliation due to reporting Mr. Terry DiPetrillo's and Mr. Michael DiPetrillo's behavior towards her.

243. Plaintiff's email stated the following:

"I was called into the Director's office this morning with Michael St. Pierre at 8:15am. Upon entering, I was informed that I was going to be suspended today following the meeting. When I asked for the reasoning I was told that a certain bid (large diameter clamps, couplings & saddles) did not meet the council deadline, and that moving forward I would need to pay more attention to the deadlines set forth. Frankly concerned by this accusation I questioned his findings. Informing him that I am certain it was sent over in a timely manner well before the deadline. He then told me that he was going to look into it further, and that if he's incorrect in dates he would then owe me an apology. The director then left the Water Department and I am unable to determine if he will be returning for the day. Attached is an email sent to the Director from purchasing where I was CC'd. Giving proof that I did meet the deadline for the bid in question. As you are aware, staff members of the Water Department were called down to personnel by a complaint filed on November 9, 2022 regarding a matter of violent behavior displayed by Terry DiPetrillo. On

November 16, 2022 Peter Broomfield, Mike St. Pierre and Myself were called into Terry's office for a meeting where we were given nothing but praise for our work ethic by the Director. Specifically directed towards me he stated that I am still learning different aspects of my job as well as himself and I shouldn't worry myself with stress that we are here to help each other. Yet today, I'm blatantly accused without facts of not performing my job correctly and the result is me being suspended. Following the allegation placed on him I can't help but feel as if this is by no stretch of the imagination a form of retaliation on his part."

244. Plaintiff received no response to her email and no swift remedial action was taken.

245. Over the next few months, through the end of 2022 into the spring of 2023, Mr. Terry DiPetrillo seemed absent often.

246. Unfortunately, when Mr. Terry DiPetrillo was absent, he had at that time seemed to delegate his authority to his brother, Mr. Michael DiPetrillo, who was left to make important decisions regarding matters of the Water Division.

247. During this time, Mr. Michael DiPetrillo accelerated his acts to further exclude Plaintiff.

248. For example, the office staff would always receive the same business cards which Plaintiff would order through their Purchasing Department.

249. In or around December of 2022, Mr. Michael DiPetrillo paid out of his own pocket and had special business cards made for everyone in the office *except for Mr. Broomfield and Plaintiff.*

250. Then, during Christmas of 2022, there was an office tree which had all of the office employees' new business cards, except for Mr. Broomfield and Plaintiff.

251. Furthermore, there was a Christmas commercial that was put together by Mayor Frank Picozzi and neither Mr. Broomfield nor Plaintiff were included in the commercial despite being heavily involved in all Water business the prior year.

252. By comparison, just the year before in 2021, all staff were included and highly involved in the planning of the commercial; however, in 2022 Plaintiff and Mr. Broomfield weren't given any

times or any information about the commercial and only the day before it was to be recorded, they heard about it but were never directly asked to be a part of it.

253. On or around February 9, 2023, Mr. Broomfield and Plaintiff were talking about Plaintiff's plans for later that evening which Mr. St. Pierre overheard.

254. Mr. St. Pierre sent an inappropriate text at 2:25 pm that stated the following, "I hope your lunch went well! Just an unsolicited opinion – you should wear your royal blue dress on your date. You look killer in that dress. Don't let it go to your head! Lol."

255. Plaintiff was extremely uncomfortable and never responded to this message.

256. That message was objectively and subjectively offensive.

257. The same day at 6:58 pm, Mr. St. Pierre sent a second text that stated, "Hey! No response from my last text to you. I hope I didn't offend you. It was meant to be complimentary..."

258. Plaintiff did not take Mr. St. Pierre's text to be a compliment but rather an inappropriate and sexually harassing remark which made Plaintiff feel uncomfortable to be around her superior.

259. Plaintiff felt degraded and deflated to have yet another one of her bosses sexually harassing her.

260. Plaintiff did not know who to report these texts to since the last time she had tried to report sexual harassment to Mr. Earls and Mr. Rotondo and she was told the sexual harassment by Mr. Terry DiPetrillo Plaintiff reported to them before was "not relevant."

261. In fact, Plaintiff sent Mr. Broomfield a copy of the text and he asked Plaintiff, "what are you going to do."

262. Mr. Broomfield and Plaintiff discussed if she should report Mr. St. Pierre and he asked Plaintiff, "are you willing to report it."

263. Plaintiff responded, something to the effect of, "who would I report it to – I've gone down that road before and was told it was irrelevant" and Plaintiff added "so I don't have much faith in the administration."

264. For the next couple of months Plaintiff avoided Mr. St. Pierre because it was uncomfortable.

265. For the next couple of months, Plaintiff was still facing hostility from both Terry and Michael DiPetrillo or they would ignore and avoid her.

266. For example, Mr. Michael DiPetrillo sat behind Plaintiff but would send her emails to communicate.

267. Or he would use a "messenger" to communicate with Plaintiff; specifically, he would go to another coworker and ask for what he needed when it was Plaintiff's job to fulfill his request, and that coworker would then go to Plaintiff to ask for what Mr. Michael DiPetrillo needed.

268. On or around April 27, 2023, Mr. Terry DiPetrillo went into the office with two (2) collapsible batons.

269. Mr. Terry DiPetrillo then announced to the office that his brother, Thomas DiPetrillo, was attacked nights prior during a bachelor party and that his brother was at the hospital in a coma.

270. At one point, Mr. Terry DiPetrillo stood next to Plaintiff's desk, and aggressively thrusted the collapsible batons in front of Ms. Ducharme, Mr. Broomfield and herself.

271. Mr. Terry DiPetrillo explained to them that he was going to use them on whoever touched his brother.

272. Plaintiff was extremely uncomfortable with Mr. Terry DiPetrillo having weapons in the office due to his history of unpredictable aggressive outbursts.

273. Then on or around April 28, 2023, a couple of months after his first inappropriate comment to Plaintiff, Mr. St. Pierre again acted inappropriately towards Plaintiff again.

274. On or about that day, Plaintiff was working alone in the office towards the end of the workday when Mr. St. Pierre entered the office to print something.

275. Plaintiff was getting ready to lock up the office at the time and Mr. St. Pierre proceeded to ask her if she wanted to "grab a quick drink."

276. Plaintiff had gone out after work with her coworkers in the past including Mr. St. Pierre but it was always a large group of coworkers and everyone, including Mr. St. Pierre, would bring their spouses.

277. Uncomfortable with the idea of getting a drink alone with one of her bosses, Plaintiff declined Mr. St. Pierre's offer and told him she had somewhere to be.

278. Plaintiff felt extremely uncomfortable to be put in this position of Mr. St. Pierre asking her to have a drink alone without coworkers or Mr. St. Pierre's wife.

279. Plaintiff was stern with her response especially since she had multiple prior incidents of sexual harassment in the office by her superiors which no one had taken seriously.

280. Soon after that interaction, on or about April 28, 2023 Plaintiff received yet another inappropriate text message from her boss Mr. St. Pierre.

281. Mr. St. Pierre's inappropriate text on April 28, 2023 stated the following:

"Ok, so I'm going to drop a bombshell here. Before I say anything, I first want you to know that I've been conflicted about revealing / telling you this because I'm not sure what or how your reaction is going to be. Just as important, I don't want to create additional awkwardness in the office, but I've got to get this off my chest… I find myself that I've developed some feelings for you. I sort of try not to reveal it that much, but I do. I don't expect you to reciprocate at all, but I want you to know. I have to ask – did you ever get a gut feeling that I like you? Again, I don't want to make you feel uncomfortable, but I simply can't hold it in any longer… I can't believe I told you, but it is what it is."

282. Plaintiff felt extremely uncomfortable about the text and did not respond.

283. Upon information and belief, Mr. St. Pierre is married.

284. Mr. St. Pierre well knew Plaintiff had a fiancé.

285. Further, Plaintiff had never given Mr. St. Pierre any indication that she was romantically interested in him by any means.

286. On or around May 1, 2023, when Plaintiff did not respond Mr. St. Pierre's texts, he then text her again and wrote, "Bree, good morning. I want to sincerely apologize for sending you that text. I was completely out of line and I deeply regret it. I am truly sorry. I had no right to send that."

287. Mr. St. Pierre called out of work sick.

288. Plaintiff feared retaliation, now from another direct boss, if she did not respond.

289. Thus, before her shift Plaintiff responded, on May 2, 2023, "Forget it was ever mentioned."

290. Following this message, Plaintiff went into work not knowing what to say or how to act.

291. Plaintiff was extremely uncomfortable at work.

292. Again, Plaintiff felt stuck and did not know who to report these texts to since the last time Plaintiff had tried to report sexual harassment to Mr. Earls and HR's Mr. Rotondo, she was told it was "not relevant."

293. Moreover, not only had Plaintiff's prior reports of sexual harassment by her bosses, and her report about Mr. Michael DiPetrillo gone unresolved, Plaintiff had been retaliated against in the aforesaid ways as a result.

294. Plaintiff feared more retaliation and an even more hostile work environment if she reported the sexual harassment by Mr. St. Pierre.

295. Thus, Plaintiff did not report these harassing texts from her boss.

296. In the following weeks, Mr. St. Pierre seemed to sulk around the office and not leave his office unless necessary.

297. Multiple coworkers picked up on this, including Mr. Broomfield, Ms. Ducharme and some of the members of the road crew.

298. Ms. Ducharme used this opportunity to pick on Plaintiff regarding the obvious attention Mr. St. Pierre had been giving Plaintiff prior to his last text.

299. For example, Ms. Ducharme would make comments to Plaintiff such as, "your buddy isn't being so nice to you today," or "Mike seems upset, Bree you should go talk to him."

300. Ms. Ducharme's comments seemed snarky and made Plaintiff uncomfortable as yet another form of harassment creating an even more hostile work environment.

301. While Mr. Terry DiPetrillo was not in the office all the time, when he was in the office, he would still make inappropriate comments either generally in front of staff or to Plaintiff.

302. For example, Mr. Terry DiPetrillo, sometime in or about mid-2023, talked about his wife's wedding anniversary and he was boasting about how he had cheated on his wife with his best friend's wife.

303. Mr. Terry DiPetrillo thought it was funny because he shared that his best friend and his wife were going to speak at his wedding anniversary party.

304. Mr. Terry DiPetrillo would also talk often about how he would go to block island and "pick up girls" and then tell the "girls" that his "wife was [his] sister."

305. Mr. Terry DiPetrillo would also often talk about his, "gumad" and say things such as "I was out last night with my gumad" and then "you know what that means right?"

306. According to urban dictionary, gumad means, "[a] word used by Italian Americans (or those that like their slang) to refer to a man's mistress."

307. These kinds of comments made Plaintiff uncomfortable.

308. On many occasions during mid to late 2023, despite feeling uncomfortable with Mr. St. Pierre, Plaintiff would still report to him, both the ongoing retaliation from Mr. Terry Dipetrillo, and his and Mr. Michael DiPetrillo's ongoing hostility towards Plaintiff.

309. Plaintiff made such reports many times during 2023, including in the last few months she was there.

310. Mr. St. Pierre would always say to Plaintiff things like, "cooler heads prevail," "I will look into this further. Don't make waves until then," or claim he was going to reach out to Mr. Earls, but he took no action.

311. Then, in or around May of 2023, Norman Metz (hereinafter "Mr. Metz"), a new hire of Mr. Terry DiPetrillo, began making inappropriate comments towards Plaintiff.

312. For example, one day while Plaintiff was busy working and Mr. Metz approached Plaintiff's desk stating boldly, "you would look a lot prettier if you smiled."

313. Plaintiff replied, "I'm not here for your entertainment."

314. From that moment on, every time Mr. Metz went near Plaintiff in the office, he would tell her to smile.

315. These comments frustrated Plaintiff as they were derogatory and a gender-based remark.

316. Not much later in or around May of 2023, Plaintiff, Ms. Ducharme, and a maintenance worker referred to as "D" were all in the office when Mr. Metz entered.

317. Mr. Metz approached Plaintiff's desk and stared at her before saying, "come outside I have something for you."

318. Confused and uncomfortable about going outside alone with him, Plaintiff replied, "No Norm I'm busy."

319. Mr. Metz glared at Plaintiff, then pleaded with her to go outside with him because he had a "gift" for her in his car.

320. Plaintiff then told Mr. Metz to leave the office, not to come in again, and to leave her alone.

321. Plaintiff was extremely uncomfortable.

322. After this incident, when Mr. Metz would be at the office, he would stop in his car and stare at Plaintiff from outside a window near her until she acknowledged him, then he would drive away.

323. These acts felt harassing and created an even more uncomfortable work environment.

324. On or around May 8, 2023, Plaintiff spoke to Mr. Broomfield about her frustrations with Mr. Metz being creepy towards her and was made aware that Mr. Metz had texted him and told him that he had a dream about Plaintiff.

325. Mr. Broomfield and Jay Moyjian (hereinafter Mr. Moyjian) both informed Plaintiff that Mr. Metz was going to other coworkers and saying that Plaintiff had come to him in a dream; he relayed publicly to Plaintiff's coworkers that in his dream Plaintiff had made out with him and took her clothes off.

326. Plaintiff was horrified by Mr. Metz's inappropriate comments about her to her coworkers; Plaintiff got shivers every time she thought about the disgusting things he had said about her.

327. At all times relevant, the harassment occurred in front of, or near, Plaintiff's bosses and Plaintiff's bosses otherwise knew about the sexual harassment but they did nothing about it.

328. In fact, Plaintiff even reported this harassment to Mr. St. Pierre just after the incident of Mr. Metz trying to get her to go outside to get a "gift"; specifically, Plaintiff said, "something needs to be done" and that he needed to "take care of it" after Plaintiff reported the ongoing harassment by Mr. Metz.

329. Notably, it was incredibly uncomfortable for Plaintiff to report sexual harassment to Mr. St. Pierre when *he had previously* sexually harassed her.

330. Mr. St. Pierre's response to Plaintiff's request that "something needs to be done" he said he would "speak with Terry [DiPetrillo]" and that they would "come up with something."

331. Nothing was done by any of Plaintiff's bosses.

332. This harassment continued for another few weeks until Mr. Metz moved departments.

333. Upon information and belief, Mr. Metz moved departments for reasons *other than* Plaintiff's reports.

334. In fact, it was Plaintiff's understanding that Mr. Metz was getting into arguments with Mr. Michael DiPetrillo and that was why he had to move departments.

335. In or around July of 2023, Mr. Terry DiPetrillo sexually harassed Plaintiff again.

336. On this instance, despite him being hostile towards Plaintiff much of the time and treating her poorly in retaliation for her prior reports, he approached Plaintiff and showed her a picture.

337. The picture he showed Plaintiff was of him grilling outside, however, he had no clothes on *other than an apron.*

338. Plaintiff was shocked and disgusted.

339. Mr. Terry DiPetrillo then said, "how do I look?"

340. Plaintiff responded by looking at Mr. Terry DiPetrillo in bewilderment and continued typing to make him go away.

341. Mr. Terry DiPetrillo walked off laughing loudly.

342. Then, on or around August 8, 2023, at approximately 8:30 am in the morning, Mr. Terry DiPetrillo approached Plaintiff's desk and said he wanted to see her in Mr. Broomfield's office so he could tell a joke and he also invited Mr. St. Pierre to come witness the "joke" as well.

343. Entering Mr. Broomfield's office, Mr. Terry DiPetrillo asked Mr. Broomfield to stand up for the joke.

344. Mr. Broomfield did as requested by the Director, Mr. Terry DiPetrillo.

345.  Mr. Terry DiPetrillo then said, "Do you want to hear my Nazi joke? Knock, knock?"

346. Mr. Broomfield began to say, "Who's there?"

347. Before the words even left Mr. Broomfield's mouth the Director, Mr. Terry DiPetrillo, open palm slapped Mr. Broomfield across the face.

348. The sound of the slap was audible and it left a red mark on Mr. Broomfield's face for hours later that day.

349. Mr. St. Pierre did not react except giving a nervous laugh before he exited the room quickly.

350. Mr. Broomfield was shocked and clearly his face hurt.

351. Mr. Terry DiPetrillo was laughing hysterically and continued laughing.

352. Plaintiff exited the room quickly.

353. Mr. Broomfield is Jewish.

354. As Plaintiff understood it, Mr. Broomfield took the assault and comments about the joke regarding Nazis as a religious-based act of harassment.

355. The next day, on or around August 9, 2023, Mr. Broomfield called out sick and Mr. Terry DiPetrillo was in the office that morning.

356. Around 2:00 pm Mr. Earls contacted Plaintiff to report to the Personnel Department/HR with Mr. Earls and Mr. Rotondo to discuss the incident that happened the day prior between Mr. Broomfield and Mr. Terry DiPetrillo.

357. Plaintiff provided a statement in support of Mr. Broomfield, verifying the assault and the Nazi comments, as well as that Mr. Broomfield is Jewish.

358. Plaintiff stated something to the effect of, "Terry DiPetrillo thought it would be funny to use an anti-sematic joke on a person of Jewish faith[4]."

359. The anti-retaliation provision of Title VII of the Civil Rights Act of 1964, and state analogs, prohibit employers from retaliating against an employee who has "…assisted or participated in" any charge of unlawful discrimination under the laws.

360. As such, Plaintiff was further protected from retaliation after her assistance in Mr. Broomfield's religious harassment and discrimination claim.

---

[4] Plaintiff said these exact same words to the police when she gave them a statement.

361. During the meeting, Mr. Rotondo asked, "is that all you have to comment about the events that happened between Terry [Dipetrillo] and Peter [Broomfield]" and Plaintiff responded, "no that is what happened yesterday."

362. Plaintiff continued, "the climate has still been hostile in the office."

363. Mr. Rotondo responded, dismissively, that "if they needed any further information they would contact [Plaintiff] directly."

364. Mr. Earls and Mr. Rotondo also told Plaintiff the meeting was to remain confidential and if Plaintiff was to go back to work and people inquired what the meeting was about, that she should tell them that she was not able to discuss it and to report that to Mr. Earls.

365. The entire meeting, since Plaintiff was yet again not allowed to elaborate after reporting a hostile work environment, was approximately five (5) minutes long.

366. After the meeting, Plaintiff went back to the Water Division to finish the workday.

367. Mr. Terry DiPetrillo left the office around 12:30 pm that day and never returned to the office.

368. Upon information and belief, Mr. Terry DiPetrillo spent the rest of that day at a bar; coworkers saw his truck at the bar and later that day, Plaintiff saw his truck there as she drove home.

369. After providing that statement to HR's Mr. Rotondo and Mr. Earls, Plaintiff felt even more retaliation by Mr. Terry DiPetrillo.

370. Moreover, those of her coworkers that were influenced by Mr. Terry DiPetrillo and his brother Mr. Michael DiPetrillo, also exiled Plaintiff more in retaliation for being a witness for Mr. Broomfield's religious discrimination claim, on top of the poor treatment and disrespect Plaintiff was already facing from those coworkers due to her own reports about the DiPetrillos.

371. For example, on or around August 10, 2023, Plaintiff went into work and she immediately noticed that many coworkers would not speak with her and even withheld information pertaining to her work for the day.

372. Then, suddenly, detectives from the Warwick Police Department contacted Plaintiff asking if she would go down to the police station and give a statement regarding the charges Mr. Broomfield was pressing against Mr. Terry DiPetrillo.

373. Around 4:30 pm that afternoon Plaintiff gave her statement to the police and was listed as a witness in that criminal matter, as Plaintiff understood it.

374. After her statement about the event with Mr. Broomfield, Plaintiff also shared with the police that she had concerns for her own safety with respect to retaliation from Mr. Terry DiPetrillo and Mr. Michael DiPetrillo to the police.

375. After giving her statement about the incident with Mr. Broomfield, Plaintiff specifically informed the police that there had been violence in the workplace; Plaintiff reported not only Mr. Terry DiPetrillo's outbursts but also the incident where Mr. Michael DiPetrillo threw a tool at her, and Plaintiff reported the various sexual harassment events she had endured.

376. As Plaintiff relayed these events, the police including, to the best of her recollection, Detective Bractko and Detective Stone, who both seemed in disbelief.

377. Plaintiff informed the police that she was fearful of going back into the office not knowing when Mr. Terry DiPetrillo would return.

378. On or around August 11, 2023, Plaintiff had a scheduled vacation day, which was requested months prior; thus, Plaintiff was not in the office on this day.

379. While Plaintiff was out on a vacation day, Mr. Terry DiPetrillo texted Plaintiff asking for her passwords to her voicemail of her direct phone line, which was very unusual and he had never done this before.

380. In or around this time, or the same day, Plaintiff received an email from MIS asking her to change her password.

381. This was an odd request given Plaintiff had just changed it a month ago and they did not have to change them except roughly quarterly.

382. Upon information and belief, Mr. Terry DiPetrillo was trying to change Plaintiff's password as another way to sabotage her.

383. Not much later in August 2023, Mr. Broomfield informed Plaintiff that Mr. Terry DiPetrillo was arrested for simple assault.

384. Upon information and belief, Mr. Terry DiPetrillo's discipline at work, for a workplace assault of Mr. Broomfield, was only a 10-day suspension and nothing more serious.

385. As August 2023 went on, the retaliation by Mr. Terry DiPetrillo, when present, as well as the retaliation by Mr. Michael DiPetrillo, and all of the coworkers they inspired, increased.

386. For example, during that time until Plaintiff's medical leave in late August 31, 2023, coworkers continued to withhold information pertaining to her work and exile her, in an increasing manner.

387. The lack of cooperation from coworkers forced Plaintiff to have to approach Mr. Michael DiPetrillo, who seemed to be in charge in his brother's absence.

388. Having to approach Mr. Michael DiPetrillo was uncomfortable for Plaintiff because he was hostile towards her, but Plaintiff needed to interact with him to do her job due to her coworkers' lack of cooperation with her.

389. Then in further retaliation for their reports, Mr. Michael DiPetrillo removed Mr. Broomfield and Plaintiff from the daily emailing list.

390. Mr. Michael DiPetrillo also removed Mr. Broomfield and Plaintiff from other forms of documentation on which their names were listed.

391. Moreover, misinformation began to appear on organizational records as a means to retaliate against Plaintiff and Mr. Broomfield.

392. For example, or around August 15, 2023, Plaintiff requested the daily sheet, as she had been removed from the emailing of it, on which Plaintiff noticed Mr. Broomfield was marked leave no pay.

393. Mr. Broomfield was not out on leave without pay because he had provided a doctor's note and should have been listed as sick.

394. Mr. Broomfield and Plaintiff were also removed from the permit access/sign offs, which is for new water line connections and prior, they had always been listed on this program.

395. Further, even Mr. St. Pierre started warning Plaintiff about Mr. Terry DiPetrillo's planned retaliation when he returned to work.

396. Specifically, on or around August 18, 2023, Mr. St. Pierre informed Plaintiff that she should "be careful of what [she] do[es]," when Mr. Terry DiPetrillo returned to work.

397. Mr. St. Pierre further explained that Mr. Terry DiPetrillo had called him the day before questioning if he had been called down to HR or the police station.

398. Mr. St. Pierre further inform Plaintiff that Mr. Terry DiPetrillo was aware that she gave a witness statement.

399. On or around August 22, 2023, during her lunch, it was brought to Plaintiff's attention by the purchasing director, Francis Gomez (hereinafter "Mr. Gomez"), that Ms. Ducharme had reached out to Mr. Gomez requesting that she be authorized to create/view purchase orders/financials.

400. Not only was this a main aspect of Plaintiff's job, but it is an authorization that only members of management have.

401. Ms. Ducharme was not a member of management.

402. Plaintiff was informed that after Ms. Ducharme made this request, she also called the MIS (IT department) requesting full access to Mr. Broomfield's email.

403. MIS informed Ms. Ducharme that she would need the Director's or the next leader in the chain of command's approval.

404. Ms. Ducharme informed Plaintiff that "Mike" gave her permission but did not clarify which Mike.

405. When Mr. St. Pierre was made aware of this, he said he would discuss it with Eric Earls and stated that Ms. Ducharme misled MIS and went above his head.

406. Upon information and belief, no such discussion about this incident with Ms. Ducharme ever occurred.

407. On or around August 23, 2023, someone had cleaned out Mr. Broomfield's office despite him *still being employed* and just out of work sick/on medical leave.

408. The remainder of the week, none of Plaintiff's coworkers would acknowledge her.

409. The work environment was incredibly hostile at that point, in retaliation for Plaintiff's various reports.

410. During that time, Mr. St. Pierre would remain in his office unless necessary to come out and would avoid eye contact with Plaintiff.

411. Ms. Ducharme only asked Plaintiff one question that week, which was "will you be in next week?"

412. Upon information and belief, Ms. Ducharme only asked this question because she knew that Mr. Terry DiPetrillo's suspension would be up the following week and he would be back.

413. Although it did not seem possible, things worsened more for Plaintiff when, on or around August 28, 2023, Mr. Terry DiPetrillo returned from his 10-day suspension.

414. On or about that day, Plaintiff received a text message at 7:59 am prior to entering the building at the start of her shift from Mr. St. Pierre.

415. Mr. St. Pierre's text stated, "come see me as soon as you get in please."

416. When Plaintiff went to Mr. St. Pierre's office, he informed Plaintiff that Mr. Terry Dipetrillo had a "no contact" order in place against her.

417. Plaintiff was shocked and baffled at the idea that Mr. Terry DiPetrillo had gotten a no contact order *against her.*

418. Mr. St. Pierre informed Plaintiff that if she had any work questions to ask him.

419. Mr. St. Pierre further informed Plaintiff that anything pertaining to her work would have go through Mr. St. Pierre, and she was to refrain from speaking with Mr. Terry DiPetrillo.

420. Plaintiff was horrified by this new turn of events.

421. Moreover, Plaintiff had done nothing wrong other than support a sexual harassment, retaliation, and Mr. Broomfield's religious discrimination and assault.

422. Upon information and belief, Mr. Terry DiPetrillo did not actually have a no-contact order against Plaintiff at this time and this was one or all of Mr. St. Pierre and/or Mr. Michael DiPetrillo and/or Mr. Terry DiPetrillo way of further retaliating against Plaintiff for her reports against all of them.

423. In fact, neither HR nor the police ever informed Plaintiff of a no contact order and she was never served with any sort of court papers indicating there was a no contact order.

424. As stated by this point even Mr. St. Pierre seemed to be retaliating against Plaintiff, even though she never reported Mr. St. Pierre's sexual harassment and inappropriate texts; he seemed to be retaliating against Plaintiff due to her supporting Mr. Bloomfield's claims of unlawful religious discrimination and assault against Mr. Terry DiPetrillo.

425. More specifically, Mr. St. Pierre would seem angry at Plaintiff during this time, seemingly upset because of Mr. Broomfield's claims which Plaintiff supported; this also resulted in Mr. Broomfield being out on leave and not able to work.

426. Moreover, Mr. St. Pierre was also upset at himself for giving a statement in the Mr. Broomfield situation, and seemed upset with Plaintiff for the same.

427. Mr. St. Pierre commented once about regretting giving a statement because, "Terry called [him]" as a result, referring to Mr. Terry DiPetrillo and implying that Mr. Terry DiPetrillo was now upset with Mr. St. Pierre

428. At around 12:00 pm that day, Mr. St. Pierre approached Plaintiff's desk while the rest of the office staff was at lunch and asked, "how're you doing?"

429. Plaintiff responded with, "if you have to ask, then you already know the answer."

430. Mr. St. Pierre then informed Plaintiff that "Terry was instructed to not have any interactions with you."

431. Plaintiff responded, "Personnel would instruct a director to not speak with one of his employees? Then why wasn't I informed of this prior?"

432. Mr. St. Pierre had no answer.

433. Plaintiff told Mr. St. Pierre she was done speaking on the matter and he went back to his office.

434. The workplace grew even more hostile at that point, as coworkers learned that Mr. Terry DiPetrillo was spreading around that he had a no contact order against Plaintiff.

435. From that point forward, the retaliation by coworkers influenced by the DiPetrillos was awful; not a single co-worker would speak with Plaintiff, even during important matters such as a water main break.

436. Plaintiff would ask a question and she was completely ignored.

437. Worse, Mr. Terry DiPetrillo would go out of his way to harass Plaintiff while still having "no contact."

438. For example, Plaintiff's desk was located directly in the middle of all other desks and was stationed directly next to Mr. Terry DiPetrillo's office.

439. While ignoring Plaintiff and standing at her desk, Mr. Terry DiPetrillo would intentionally talk to others while being next to Plaintiff and ignoring her entirely.

440. As another related example of his retaliation, multiple times throughout that time, Mr. Terry DiPetrillo stood in front of Plaintiff's desk, placing his hand on her desk, and carried on a casual conversation with all other employees except Plaintiff.

441. After leaving the office on August 28, 2023, Plaintiff began calling therapists as her mental health had been severely affected by the ongoing retaliatory harassment she had been facing at work for months.

442. On or around August 29, 2023, Plaintiff called out sick.

443. On or around August 30, 2023, Plaintiff again, called out sick and began mental health treatment with Lifestance Health's Kathryn Rouse.

444. After leaving the appointment, Plaintiff received a phone call from a coworker to turn on her radio to hear Matt Allen (hereinafter "Mr. Allen") of the WPRO News Podcast.

445. Mr. Allen spoke of the incident at the Water Division office in great detail and even named Mr. St. Pierre and Plaintiff as witnesses, reading aloud parts of the statements given to the police.

446. Listening to this radio broadcast severely increased Plaintiff's anxiety as to how she would be treated by Mr. Terry DiPetrillo and Mr. Michael DiPetrillo if she returned to work.

447. On or around August 31, 2023, Plaintiff's therapist provided her with a note for a leave of absence, Plaintiff then forwarded the note to the Personnel Department/HR.

448. Plaintiff was never offered FMLA or the state equivalent.

449. Plaintiff believed not being offered FMLA was an interference with her rights for that federal and state benefit.

450. On or around September 5, 2023, the Personnel Department requested a revised letter with a date of return or last scheduled appointment with Plaintiff's therapist.

451. Plaintiff provided the note requested on or about September 8, 2023, stating September 27, 2023 as her last scheduled appointment.

452. On or around September 11, 2023, Lynn Costa (hereinafter "Ms. Costa") of the Personnel Department emailed Plaintiff:

> "You will be running out of sick time after today. Do you want to go LNP (leave no Pay), or do you want to use your vacation/PL time? If you want to be leave no pay, please write an email stating that you have exhausted all of your sick time and would like to believe no pay through 9/27 (which is your next doctor appointment). If you want to use your vacation/PL time, please indicate how much time you want to use (all of it, or save a week or so for vacation after you come back). I have to get that approved. Please let me know, and if you have any questions, please let me know that too."

453. In response, Plaintiff instructed the Personnel Department, "If the PI/FH could be used first-followed by the vacation time accrued until next Friday the 22nd, if that's at all possible. I would like to refrain from marking myself as LNP. I have 105 hours of vacation time- and 2 floating-from the documentation I have. Please let me know if there are any questions or advisement."

454. On or around September 25, 2023, Ms. Costa emailed Plaintiff, "I just wanted to touch base with you. You have 55 hours of vacation/PL to use as of today. Do you want to use those hours for today through 9/27? Will you be returning to work on 9/28? If you do return to work, we will need a note stating you are able to return to work full duty, no restrictions."

455. On or around October 6, 2023, Plaintiff started leave with no pay.

456. During this entire time, Plaintiff continued to receive ongoing medical treatment.

457. Plaintiff used all of her sick time and vacation time due to the distress leaders of her employer created for her due to their own sexual harassment and their retaliation against her following various reports of unlawful acts.

43

458. Plaintiff was terrified of Mr. Terry DiPetrillo and Mr. Michael DiPetrillo and almost every therapy appointment was centered around her issues at work.

459. During a session, Plaintiff's therapist asked her if she should even go back to work.

460. Plaintiff informed her therapist that she needed her job and benefits, but she could not yet bring herself to go back yet and face that hostile work environment.

461. Plaintiff began to, and continue to, avoid running errands or going to stores around Warwick in fear since the DiPetrillo family was so well known.

462. During another therapy session, Plaintiff expressed hesitation for even returning back to work to which her therapist validated by responding that her work environment was very hostile.

463. By October 11, 2023, Plaintiff felt she could not return to that extremely hostile environment where Plaintiff faced retaliation daily.

464. No reasonable person in Plaintiff's circumstances could have remained in that severely and pervasively hostile work environment.

465. Thus, on or about October 11, 2023, Plaintiff emailed the City of Warwick Division of Personnel an in-depth resignation letter in which Plaintiff detailed the harassment and hostility she faced while employed by the Water Division.

466. Plaintiff's resignation letter read as follows:

"Throughout the course of my employment but escalating in the past year and a half being employed by this City, I have endured sexual harassment from co-worker Norman Metz within the city as well as sexual harassment from the Director of the Water Division Terry DiPetrillo and Business Manager Michael St. Pierre. I have expressed concern of this sexual harassment and then the later retaliation after I reported this and nothing has been done. I have filed reports along the chain of command and had verbal conversations with these superiors about this harassment including reporting this to Eric Earls and Michael St. Pierre (reported in 2022 through mid 2023), and HR's Steven Rotondo (several emails and verbal conversations 2022 through 2023), the former Chief of Staff Susan Nahabedian (emailed her copying Michael St. Pierre and Steven Rotondo in late 2022). Action was never taken.

 I would be told to follow the chain of command to report my concerns of sexual harassment even when I told HR's Steven Rotondo about this harassment. He did not do anything to investigate other than speak to a few people and then the sexual harassment by Terry and Michael continued. For example, even in 2023 Micheal would comment about my dress telling me I "looked good in that dress" and he would call me pet names publicly like "dear" and "sweetheart". Also Michael and coworker Norman would often say to me I would "look prettier if I smiled". I was highly offended by this treatment and expressed these concerns to superiors/management and HR often. Again nothing was done.

As for Terry, just in the year 2023, when Terry did come into the Water Division for work he perfused of alcohol and I endured his sexual commentary and offensive nature on those days. During 2023 (and before) this occurred multiple times a week until my stress leave in August of 2023. Employees, including supervisors and superiors/management, at the DPW-Water Division were well aware of what was being said as they've been present for it. Supervisors and superiors/management turned a blind eye when action should have been taken to stop Terry's (and then Michael's and later Norman's) harassment of me. Some examples of what I endured from Terry was that he was going to "run a train on me" (a sexual reference). He said this to me in front of everyone else which humiliated me. He would frequently say things, implying we were having sex, publicly such as "Bree I left my socks by your bedside table". He would also show me pictures of his naked back end and ask me how he looked. I was highly offended by this treatment and expressed these concerns to superiors/management and HR often. Again nothing was done.


In May of 2023, I received a text from Michael St. Pierre where he told me he had to confess that he had feelings for me, and had to get it "off his chest" and implied he wanted "more" and asked me if I knew "he liked me". That text made coming to work even more awkward and uncomfortable. Then in the summer of 2023, soon after Mike's text, Norman Metz would come to my desk weekly and tell me he was having inappropriate dreams about me and would make other inappropriate comments. Such as once he tried to get me to follow him to his car to give me a present or otherwise tried to get me to spend time outside of work. I am an engaged woman and they all know that but show zero respect to me. Norman would also text coworkers about me, such as to tell my coworkers to tell me he is "thinking about me". I told Michael St. Pierre about this harassment, which was incredibly uncomfortable to even have a conversation with him because of his text to me.

Then, after repeatedly reporting the sexual harassment, it would get back to Terry and later Michael, and then I was blacklisted and they retaliated against me in many ways. I was not told information I needed to do my job, they would withhold messages and information from me, and otherwise exclude me and direct my coworkers to do the same. I was told by

others that Terry would instruct my coworkers to withhold information from me and otherwise treat me badly. I then told this to Michael St. Pierre and his response was "don't make waves" and told me to "keep my head down."

The assault that took place between Terry DiPetrillo and Peter Broomfield, I was a witness to and this was documented with both your department as well as the police department. I also faced retaliation from this event as well but his retaliation of me just grew over the summer. For example, when Terry DiPetrillo returned from his suspension, he stated to Michael St. Pierre and others that he had a no contact order in place against me and I was not to speak with him. That was never the truth. I was also removed from the daily sheets. Being the Water Project Supervisor, it's somewhat impossible to perform my job to the best of my ability when not only other co-workers but my own Director won't acknowledge my presence. There was other sabotage to harass me such as trying to change the password on my voicemail and they would also reach out to the personnel director to try to remove me from accounts payable and receivable, which is an important part of my job.

Finally in August of 2023, I was instructed by Michael St. Pierre that I was not to speak to Terry yet Terry would come to my desk, putting his hands on my desk, and had a conversation with everyone else around me while I was physically the closest to him. He intentionally ignored me and made a big show of it humiliating me. He and Terry then made sure I did not have the information I needed to do my job because they instructed my coworkers to withhold from me which got worse. I had no choice but to contact my doctor because the stress was too much to take with the long-standing, ongoing very open sexual harassment and then retaliation. Therefore, I went out of work on stress leave in late August. I have been out since.

I do not know why but I was never offered FMLA. I have been out on leave using my sick and vacation time. Now that this is expired, I am told I have to go through a whole application process to continue "working" there on leave without pay status. I was told I needed to get notes from my doctor and therapist as well as fill out other paperwork and an application. The only reason I am on stress/medical leave is due to the treatment I have endured at work for about a year and a half which I complained about and was never fixed. I have waited patiently for something to be done to stop these men and I did everything right reporting up the chain of command. The best response I ever got was "don't make waves" versus having any superior, manager or HR stop this conduct. After seeking medical treatment from a therapist and continuing to seek treatment currently, we've spoken and feel that I have no other choice but to leave there and not return for my own safety, mental health and well being.

Please accept this email as my formal resignation as of today from the Water Division."

467. As a direct and proximate result of her employer's discriminatory actions, Plaintiff suffered and continue to suffer loss of income and earning capacity; loss of work-related benefits, privileges, promotions, and status; experienced humiliation and loss of standing in the community; suffered and continue to suffer from extreme emotional distress and mental anguish resulting in physical injury; and suffered other injuries, all continuing to date.

**COUNT I**
*GENDER AND SEX HARASSMENT / DISCRIMINATION – DISCRIMINATORY TERMS AND CONDITIONS*
*GENDER AND SEX HARASSMENT / DISCRIMINATION - DISCRIMINATORY CONSTRUCTIVE DISCHARGE*
***Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2***
***Violation of RI Fair Employment Practices Act, R.I. Gen 1956 § 28-5-1 et seq. (FEPA)***
***Rhode Island Civil Rights Act of 1990,* R.I. Gen. Law § 42-112-1 *et seq.* (RICRA)**

468. Paragraphs 1 - 467 are hereby incorporated by reference in their entirety.

469. Plaintiff is afforded protections from sexual and gender harassment and discrimination, and thereby her sex under Title VII, FEPA, and RICRA.

470. Defendant subjected Plaintiff to severe and pervasive sexual harassment and disparate treatment, as well as an unresolved hostile work environment, which changed the terms and conditions of employment.

471. Defendants knew of the harassing and discriminatory conduct but failed to take swift, remedial action in violation of, *inter alia*, Title VII, FEPA, and RICRA.

472. Defendants' agents created such a hostile work environment that no reasonable person could have remained in that job; as a result, Plaintiff was constructively discharged/terminated due to Defendants' discrimination.

473. Defendants constructively terminated Plaintiff because of gender/sex

474. But for Defendant's discriminatory conduct, Plaintiff would not have been constructively terminated.

475. Plaintiff experienced the aforesaid and incorporated damages as a direct and proximate result of Defendant's intentional conduct.

476. Defendant's discriminatory conduct, policies, and practices were intentionally discriminatory, motivated by animus, impermissible, and unlawful considerations and violate, *inter alia*, Title VII, FEPA, and RICRA.

477. Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

478. Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

479. Defendant is vicariously responsible for the acts and omissions of its agents under Respondeat Superior.

**COUNT II**
*GENDER AND SEX RETALIATION – RETALIATORY TERMS AND CONDITIONS*
*GENDER AND SEX RETALIATION - RETALIATORY CONSTRUCTIVE DISCHARGE*
***Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3***
***Violation of RI Fair Employment Practices Act, R.I. Gen 1956 § 28-5-1 et seq. (FEPA)***
***Rhode Island Civil Rights Act of 1990, R.I. Gen. Law § 42-112-1 et seq. (RICRA)***

480. Paragraphs 1 - 467 are hereby incorporated by reference in their entirety.

481. Plaintiff was protected from retaliatory harassment, discrimination and termination as a result of engaging in protected conduct under Title VII, FEPA, and RICRA.

482. Plaintiff engaged in protected conduct, opposed unlawful conduct and exercised her rights under the Title VII, FEPA, and RICRA.

483. Specifically, Plaintiff reported sexually harassing comments and gender-discrimination to leadership and HR, both of which protected under Title VII, FEPA, and RICRA.

484. As a result of Plaintiff's protected activity, Plaintiff was subjected to retaliatory treatment by Defendant's agents.

485. Additionally, as a result of Plaintiff's protected activity, Defendants' agents created such a hostile work environment that no reasonable person could have remained in that job; as a result, Plaintiff was constructively discharged due to Defendants' retaliation.

486. But for Defendants' agents' retaliatory conduct, Plaintiff would not have been constructively discharged.

487. Defendant's agents' retaliatory conduct, policies, and practices were intentionally retaliatory, motivated by animus, impermissible and unlawful considerations and violate, *inter alia*, Title VII, FEPA, and RICRA.

488. Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

489. Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

490. Defendant is vicariously responsible for the acts and omissions of its agents under Respondeat Superior.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court:

a.  Order judgment for Plaintiff against Defendant on all Counts of the Complaint and declare that the practices detailed in this Complaint are unlawful;

b.  Order, for all applicable Counts, that Defendant make Plaintiff whole by awarding appropriate back pay with interest, front pay, compensation for all other lost income and benefits, earning capacity, and all other relevant entitlements and emoluments;

c.  Order, for all applicable Counts, that Plaintiff be awarded an amount of money which will fairly compensate her for his mental anguish, emotional pain and suffering, damage to her reputation, loss of standing in the community, and other damages incurred;

d.  Order, for all applicable Counts, that the Defendant pay Plaintiff's costs and reasonable attorney's fees resulting from this action;

e.  Order, for all applicable Counts, that the Defendant pay punitive or exemplary damages, as appropriate to punish Defendant for their malicious conduct, recklessness conduct, and/or callous indifference to the statutorily and common law protected rights of Plaintiff;

f.  Order, for all applicable Counts, that Defendant pay post-judgment interest where appropriate and allowable by law;

g.  Order, for all applicable Counts, that Defendant pay pre-judgment interest, including interest for all damages awarded to Plaintiff from the date the cause of action accrued, where appropriate and allowable by law;

h.  Retain jurisdiction of this action to ensure full compliance; and

i.  Order, for all Counts, such other relief to Plaintiff as this Court deems just and proper.

### DEMAND FOR JURY TRIAL

***PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE***

June 14, 2024

Respectfully Submitted,
**Plaintiff Bree Boulais,**
By her attorney,

 /s/ Paige Munro-Delotto
Paige Munro-Delotto, Ph.D., Esq. #9291
Munro-Delotto Law, LLC
400 Westminster St., Ste. 200
Providence, RI 02903
(401) 521-4529
(866) 593-9755 (fax)
Email: Paige@pmdlawoffices.com